## UNITED STATES COURT OF INTERNATIONAL TRADE
## NEW YORK, NEW YORK

| | |
|---|---|
| NETUNO USA, INC.,<br><br>                Plaintiff,<br><br>v.<br><br>DONALD J. TRUMP, *in his official capacity as President of the United States*; EXECUTIVE OFFICE OF THE PRESIDENT; the UNITED STATES OF AMERICA; UNITED STATES CUSTOMS AND BORDER PROTECTION; PETE R. FLORES, *in his official capacity as Acting Commissioner of United States Customs and Border Protection*; JAMIESON GREER, *in his official capacity as United States Trade Representative*; OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE; HOWARD LUTNICK, *in his official capacity as Secretary of Commerce*,<br><br>                Defendants. | Case No. 25-00245 |

## COMPLAINT

### INTRODUCTION

1. Through a series of executive orders, proclamations, and memoranda, the President of the United States has declared national emergencies, imposed tariffs on imported merchandise, and modified tariff rates, timing, and scope. These measures are unlawful and unconstitutional.

2. The President claims authority under the International Emergency Economic Powers Act (IEEPA), 50 U.S.C. §§ 1701–1708, to impose sweeping tariffs on goods imported into the United States. But IEEPA does not authorize the President to levy tariffs, and Congress has never delegated such power. The President's actions exceed the bounds of any statute and

violate the Constitution's separation of powers by arrogating to the executive branch Congress's exclusive authority to impose duties and regulate commerce with foreign nations.

3. The national emergencies declared by the President do not constitute "unusual and extraordinary threats" within the meaning of IEEPA. Instead, they rest on ordinary economic conditions—such as trade deficits and foreign competition—that have existed for decades and cannot plausibly justify emergency action. The President's reliance on IEEPA to unilaterally impose tariffs is therefore unlawful.

4. Even if IEEPA could be read to confer such authority, its application here would render the statute unconstitutional. A construction that allows the President to impose duties of any kind, in any amount, on any country, at any time, would represent an impermissible delegation of Congress's legislative power under Article I, Section 8, to lay and collect taxes, duties, imposts, and excises.

5. The challenged executive actions have caused and will continue to cause substantial harm to American importers, including Plaintiff, who are required to pay unlawful duties, alter established supply chains, and absorb economic losses as a direct consequence of measures imposed without congressional authorization.

6. This Court should declare the President's actions unlawful, set aside the tariffs imposed pursuant to them, enjoin further enforcement or collection under the challenged orders, and order the refund of any duties unlawfully collected.

## JURISDICTION

7. The Court of International Trade has exclusive jurisdiction to hear this action under 28 U.S.C. §1581(i), which gives the Court:

exclusive jurisdiction of any civil action commenced against the United States, its agencies, or its officers, that arises out of any law of the United States providing for--

> (A) revenue from imports or tonnage;
>
> (B) tariffs, duties, fees, or other taxes on the importation of merchandise for reasons other than the raising of revenue;
>
> (C) embargoes or other quantitative restrictions on the importation of merchandise for reasons other than the protection of the public health or safety; or
>
> (D) administration and enforcement with respect to the matters referred to in subparagraphs (A) through (C) of this paragraph and subsections (a)-(h) of this section.

28 U.S.C. §1581(i)(1). *See also, V.O.S. Selections, Inc. v. United States*, 772 F.Supp.3d 1350, 1365-1366 (2025).

8. The Court possesses all the powers in law and equity of, or as conferred by statute upon, a district court of the United States. 28 U.S.C. § 1585. The Court may enter a money judgment for or against the United States in any civil action commenced under 28 U.S.C. § 1581 or 28 U.S.C. § 1582 and may also order any other form of relief that is appropriate in a civil action, including but not limited to declaratory judgments, orders of remand, injunctions, and writs of mandamus and prohibition. 28 U.S.C. §§ 2643(a)(1), (c)(1).

9. The Court also has "jurisdiction to consider challenges to the President's actions in suits against subordinate officials who are charged with implementing the presidential directives". 28 U.S.C.A. §1581(i); *V.O.S. Selections*, 772 F.Supp. 3d at 1367, quoting *USP Holdings, Inc. v. United States*, 36 F.4th 1359, 1366 (Fed. Cir. 2022).

## PARTIES

10. Plaintiff Netuno USA, Inc. ("Netuno") is a Florida corporation with its principal place of business in Fort Lauderdale, Florida. Netuno is an established importer and distributor of seafood products sourced from multiple foreign countries, including Brazil, Ecuador,

Panama, India, China, and Indonesia. The company has operated for more than three decades and supplies major retailers, wholesalers, and food service distributors throughout the United States.

11. Netuno's business depends on the continuous and predictable importation of seafood from abroad. Many of the products it imports are not reasonably available from domestic suppliers and cannot be substituted without significant additional cost or disruption to the company's operations.

12. The unlawful tariffs imposed pursuant to the challenged executive orders have directly affected Netuno's imported merchandise, forcing it to pay duties far in excess of those authorized by law. These increased costs have reduced profit margins, disrupted established supply relationships, and impaired the company's ability to compete in domestic and international markets.

13. Defendant Donald J. Trump is the President of the United States and is sued in his official capacity.

14. Defendant Executive Office of the President is an agency of the United States government headquartered in Washington, D.C. It oversees the implementation of the President's directives and the Office of the United States Trade Representative.

15. Defendant United States of America is the sovereign government of the United States.

16. Defendant United States Customs and Border Protection ("CBP") is an agency within the Department of Homeland Security charged with administering and enforcing the collection of tariffs, duties, and other import restrictions under the Harmonized Tariff Schedule of the United States. CBP is headquartered in Washington, D.C.

17. Defendant Pete R. Flores is the Acting Commissioner of U.S. Customs and Border Protection and is sued in his official capacity.

18. Defendant Jamieson Greer is the United States Trade Representative and is sued in his official capacity.

19. Defendant United States Trade Representative ("USTR") is a component of the Executive Office of the President that develops and coordinates U.S. international trade policy. It is headquartered in Washington, D.C.

20. Defendant Howard Lutnick is the Secretary of Commerce and is sued in his official capacity.

## TIMELINESS OF THIS ACTION

21. Plaintiffs commenced this action by filing a summons and complaint with the Court on November 5, 2025. As this matter has been commenced within two years of the action of the United States, such action satisfies the timeliness requirement in accordance with 19 U.S.C. § 1621.

## STANDING

22. To establish a standing, a plaintiff must show injury in fact, causation, and redressability. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561 (1992). Plaintiffs are harmed by the challenged tariff action because each Plaintiff directly imported goods from China and other countries subject to the Challenged Orders, and each thus must pay additional tariffs to the federal government because of the Challenged Orders and corresponding revisions to the HTSUS. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021) ("If a defendant has caused physical or monetary injury to the plaintiff, the plaintiff has suffered a concrete injury in fact under Article III."); *Hein v. Freedom From Religion Found., Inc*., 551 U.S.

587, 599 (2007) ("being forced to pay" money to the government "causes a real and immediate economic injury"). Declaratory and injunctive relief will redress these injuries because Plaintiffs will no longer be required to pay the tariff or make harmful changes to their business operations to account for increased costs.

## FACTS

**A.    National-Emergency Framework and IEEPA's Limits**

23. Congress enacted the National Emergencies Act (NEA) to cabin and supervise any resort to emergency powers; it requires a formal proclamation, publication in the Federal Register, transmittal to Congress, identification of the statutes invoked, and periodic renewal or termination. The NEA also provides expedited procedures for Congress to terminate an emergency.

24. The International Emergency Economic Powers Act (IEEPA) permits the President—upon a proper NEA emergency—to regulate certain international economic transactions to address an "unusual and extraordinary threat" with a substantial foreign source to U.S. national security, foreign policy, or the economy. IEEPA's authorities are triggered only after a NEA-compliant emergency is declared, and they may be exercised only to meet the specified threat. IEEPA does not itself delegate a general tariff-making power.

**B.    2025 Executive Tariff Program and Phased Escalations**

25. On February 1, 2025, the President issued Executive Order 14195, imposing a 10 percent ad valorem duty on products of the People's Republic of China, effective 12:01 a.m. eastern time on February 4, 2025; the order was published in the Federal Register on February 7, 2025. The order also directed special treatment for goods admitted to foreign-trade zones on or after that effective date.

26. On March 3, 2025, the White House issued a further amendment (identified in Federal Register materials as Executive Order 14228) increasing the China rate from the initial 10 percent to 20 percent and adjusting related mechanics. Subsequent April 2, 2025 materials addressed application to low-value imports previously moving under de minimis.

27. On April 2, 2025, the President issued Executive Order 14257, establishing a reciprocal-tariff framework tied to large and persistent U.S. goods trade deficits, with country-specific ad valorem rates listed in annexes. Unless otherwise provided, the order applied beginning 12:01 a.m. eastern daylight time on April 9, 2025, to goods entered for consumption (or withdrawn from warehouse) on or after that time. Critically, the annexes included a "on the water" exemption clause for goods "loaded onto a vessel at the port of loading and in transit on the final mode of transit before 12:01 a.m. [EDT] on April 9, 2025," subject to enumerated exceptions.

28. On April 9, 2025, an order modified reciprocal rates to reflect trading-partner retaliation and alignment; on April 11, 2025, a presidential memorandum clarified exceptions and carve-outs (including specified HTS headings).

29. Through mid-2025, the White House and Federal Register issued follow-on actions adjusting timing and suspensions, including a July 10, 2025 extension of reciprocal-rate modifications to 12:01 a.m. EDT on August 1, 2025, and later updates relating to PRC-specific treatment.

30. On July 30, 2025, the President issued Executive Order 14323, "Addressing Threats to the United States by the Government of Brazil," declaring a national emergency under IEEPA/NEA and imposing an additional duty on Brazilian-origin products. The Federal Register publication (Aug. 5, 2025) confirms an "on the water" exemption provision: goods

are exempt if (1) they were loaded at the port of loading and "in transit on the final mode of transit" before 12:01 a.m. EDT seven days after the order, and (2) they are entered for consumption (or withdrawn from warehouse) before 12:01 a.m. EDT on October 5, 2025.

31. On July 31, 2025, the President amended earlier "northern border" duties to increase the Canadian rate to 35 percent, effective August 1, 2025, as reflected in White House and contemporaneous notices.

32. On August 6, 2025, the President issued Executive Order 14329 ("Addressing Threats to the United States by the Government of the Russian Federation"). Implementing guidance from U.S. Customs and Border Protection and the Federal Register followed on August 27, 2025, specifying additional duties on "products of India" and setting an "entered before" date for entries already in transit. Trade compliance bulletins summarize the CBP implementation: entries before 12:01 a.m. EDT on September 17, 2025, could qualify for prior rates.

33. The 2025 tariff instruments repeatedly use the same "on the water" exemption formulation: goods are excluded if they were "loaded onto a vessel at the port of loading and in transit on the final mode of transit" before the stated cut-off (e.g., April 9, 2025 for the reciprocal order; seven-day window for Brazil; September 17, 2025 entry cut-off in CBP's India implementation). If a shipment is off-loaded and re-loaded at an intermediary port (e.g., a Brazil-origin container off-loading in Panama for feeder service), the cargo may no longer be "in transit on the final mode of transit," defeating the carve-out and exposing the entry to the higher rate. The operative "in transit/final mode" language appears in the annex HTS notes to the reciprocal order and in the Brazil publication.

34. The China orders and de minimis/low-value amendments likewise tied application to precise effective moments (e.g., 12:01 a.m. Feb. 4, 2025 for FTZ admissions and PRC goods), reinforcing that timing and transactional posture control duty treatment.

35. As a statutory basis, the Liberation Day Order, Executive Order 14323, Executive Order 14257, and Executive Order 14329 all cite the International Emergency Economic Powers Act of 1977, 50 U.S.C. § 1701 et seq. ("IEEPA"), the National Emergencies Act, 50 U.S.C. § 1601 et seq., section 604 of the Trade Act of 1974, as amended, 19 U.S.C. § 2483, and section 301 of title 3, United States Code.

36. None of these statutes grants the President the authority to impose tariffs, and the extent that the provide for any relief, there must be an actual "emergency". Such statutes do not permit the taking of relief on an unsupported pretext.

37. The Constitution explicitly reserves to Congress the power to "lay and collect taxes, duties, imposts and excises," and "[t]o regulate commerce with foreign nations." U.S. Const. art. I, § 8 cl.1, 3.

38. Title 19 of the United States Code, "Customs and Duties," (as opposed to Title 50, "War and National Defense") is where one would expect to find such presidential authority, but it makes no mention of such authority.

39. Congress knew how to grant the President tariff authority when it wants to.

40. Under 19 U.S. Code § 1862, the President has a clear framework for adjusting duties and import restrictions for the purpose of "safeguarding national security." Yet the President has attempted to avoid that framework by stretching Congress's specific grant of emergency authority into general tariff authority. *See Nat'l Fed'n of Indep. Bus. v. Occupational Safety & Health Admin.*, 595 U.S. 109, 125 (2022) (quoting *Whitman v. Am.*

*Trucking Ass'ns*, 531 U.S. 457, 468 (2001)) (Congress "does not . . . 'hide elephants in mouseholes'").

41. Other specific grants of authority for the President to impose tariffs in limited specific circumstances exist. Under 19 U.S.C. § 2411, the President may impose tariffs on other countries that have violated trade agreements. And the President may provide specific, targeted relief to industries that need time to adjust to foreign competition pursuant to 19 U.S.C. § 2251.

42. IEEPA provides that the President may:

(A) investigate, regulate, or prohibit—

(i) any transactions in foreign exchange,

(ii) transfers of credit or payments between, by, through, or to any banking institution, to the extent that such transfers or payments involve any interest of any foreign country or a national thereof,

(iii) the importing or exporting of currency or securities, by any person, or with respect to any property, subject to the jurisdiction of the United States;

(B) investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States . . . .

50 U.S.C. § 1702.

43. IEEPA further provides that these authorities "may only be exercised to deal with an unusual and extraordinary threat with respect to which a national emergency has been declared for purposes of this chapter and may not be exercised for any other purpose." 50 U.S.C. § 1701(b).

44. The word "tariff" does not appear in the IEEPA, nor does any synonym or equivalent.

45. No previous President has used IEEPA to impose tariffs, except for President Trump himself briefly during his first term, in an executive action that was withdrawn before it was fully implemented or subject to judicial review. Cong. Research Serv., *Congressional and Presidential Authority to Impose Import Tariffs*, R48435, at 20 (April 23, 2025), https://crsreports.congress.gov/product/pdf/R/R48435

46. The "unusual and extraordinary threat" asserted as a "national emergency" by the Liberation Day Order is not an emergency, and is not unusual, extraordinary, new, unexpected, odd, or even surprising.

47. According to the Liberation Day order, the President "find[s] that underlying conditions, including a lack of reciprocity in our bilateral trade relationships, disparate tariff rates and non-tariff barriers, and U.S. trading partners' economic policies that suppress domestic wages and consumption, as indicated by large and persistent annual U.S. goods trade deficits, constitute an unusual and extraordinary threat to the national security and economy of the United States. That threat has its source in whole or substantial part outside the United States in the domestic economic policies of key trading partners and structural. imbalances in the global trading system. I hereby declare a national emergency with respect to this threat."  Exec. Order No. 14257, *Regulating Imports With a Reciprocal Tariff To*

*Rectify Trade Practices That Contribute to Large and Persistent Annual United States Goods Trade Deficits*, 90 Fed. Reg. 15041 (Apr. 7, 2025).

48. In other words, the national emergency claimed to be unusual and extraordinary in this case is the existence of bilateral trade deficits in goods (excluding services, for which the United States runs a trade surplus with the world) with some foreign trading partners.

49. Trade deficits are not unusual or extraordinary—the United States has run a persistent trade deficit since the 1970s. Brian Reinbold, Yi Wen, *Historical U.S. Trade Deficits*, Federal Reserve Bank of St.Louis, May 17, 2019 (https://www.stlouisfed.org/on-the-economy/2019/may/historical-u-s-trade-deficits?utm_source=chatgpt.com).

50. That necessarily includes bilateral trade deficits with many individual nations.

51. Nor are trade deficits an emergency or even necessarily a problem; they simply mean that some other country sells lots of things Americans want to buy, or that its people are unwilling or unable (often because of poverty) to purchase many American goods.13

52. Section 604 of the Trade Act of 1974 provides that "[t]he President shall from time to time, as appropriate, embody in the Harmonized Tariff Schedule of the United States the substance of the relevant provisions of this chapter, and of other Acts affecting import treatment, and actions thereunder, including removal, modification, continuance, or imposition of any rate of duty or other import restriction." 19 U.S.C. § 2483.

53. Section 604 is a bookkeeping provision: it assigns to the President the task of periodically updating the Harmonized Tariff Schedule to reflect changes in policy that have occurred. It does not set out any power, authority, or process by which the President may unilaterally set such policies.

54. The National Emergencies Act, 50 U.S.C. § 1601 et seq., provides the general framework for declarations of national emergencies. It explicitly disclaims granting any substantive authority itself, instead requiring that "[w]hen the President declares a national emergency, no powers or authorities made available by statute for use in the event of an emergency shall be exercised unless and until the President specifies the provisions of law under which he proposes that he, or other officers will act." 50 U.S.C. § 1631. 37.

55. 3 U.S.C. § 301 gives the President "[g]eneral authorization to delegate functions" to subordinate federal officials. It has nothing to do with tariffs or trade regulation.

56. The Administration is now trying to reframe its actions and by re-labeling the tariffs as surcharges in order to alter the constitutional reality,

57. At an October 15, 2025 Treasury Department press conference, Treasury Secretary Scott Bessent was asked directly why the President's tariffs on imported goods were not taxes. Secretary Bessent responded: "That is easy, because tariffs are a surcharge. They could be paid by the port—or exporter—they could be paid by the country. When you get a driver's license, you pay a fee. Is that a tax?"  Treasury Sec'y Scott Bessent & U.S. Trade Rep. Jamieson Greer, Press Conference (Oct. 15, 2025 11:03 PM – 11:31 PM), C-SPAN  (video at 11:19 PM), available at https://archive.org/details/CSPAN_20251016_030300_Treasury_Secy._Bessent__U.S._Trade_Rep._Greer_Hold_Press_Conference_on.../start/960/end/1020

58. This statement reflects the administration's evolving position that the tariffs imposed under Executive Order 14257 and related proclamations are merely "surcharges" or "fees," not "taxes," and thus fall outside the scope of Article I, Section 8's limits on Congress's exclusive authority "to lay and collect Taxes, Duties, Imposts, and Excises."

59. Tariffs are duties within the meaning of Article I, Section 8, regardless of nomenclature. They are imposed on imported goods, collected at the border, and generate revenue for the Treasury—precisely the attributes of a tax. The administration's semantic distinction underscores the weakness of its position: having conceded that Congress did not authorize these duties under IEEPA, it now attempts to avoid judicial scrutiny by asserting that the exactions are not "taxes" at all.

60. The contention that a tariff is not a tax defies both the plain meaning of the word and the understanding established through long-standing historical and legal usage. "A tariff is a tax levied on imported goods and services." Cong. Research Serv., *U.S. Tariff Policy: Overview*, IF11030, at 1 (Jan. 31, 2025), https://www.congress.gov/crs-product/IF11030.

## C.    Netuno and the 2025 tariff program

61. Netuno USA, Inc. is a Florida importer and distributor of seafood products sourced principally from Brazil, Ecuador, Panama, Mexico, Indonesia, China, and India, supplying U.S. wholesalers, food-service distributors, and supermarkets. Netuno's supply chains rely on predictable HTS duty rates. Its business model depends on steady access to sustainable fisheries abroad that can meet domestic demand without depleting U.S. waters.

62. Following issuance of Executive Order 14257 ("reciprocal tariffs"), the Brazil-specific Executive Order 14323 (additional Brazil duties), and the India duties implemented under Executive Order 14329, Netuno's landed costs increased sharply and without warning. Several 2025 consignments departed origin just before the applicable effective dates but, because shipping lines routed them through intermediary ports such as Panama en route to the United States, customs brokers determined that the shipments were not "in transit on

the final mode of transit" by the statutory cut-off—and applied the higher tariff rates at entry.

63. Netuno brings this action to set aside and enjoin the challenged duties, to confirm the in-transit and "on the water" exemption protections for qualifying voyages, and to recover duties unlawfully assessed on shipments that departed origin before the specified effective dates or otherwise fall outside lawful tariff authority.

64. The uncertainty and volatility of the tariff regime have inflicted direct harm on Netuno's operations. As an importer, Netuno must post prices and negotiate supply contracts months in advance, and it cannot revise those prices. The unpredictable and escalating tariffs prevent Netuno from committing to future orders, disrupt its ability to secure product that satisfies U.S. consumer demand, and limit sourcing from healthy, well-managed fisheries abroad. The resulting cash-flow strain reduces inventory levels, curtails new purchase orders, and constrains the company's capacity to supply domestic markets—undermining its competitiveness and harming the restaurants, retailers, and distributors it serves.

### STATEMENT OF CLAIMS

**Count I: The President's Action Levying Tariffs Exceeds His Statutory Authority.**

65. The allegations of paragraphs 1 through 64 are incorporated by reference and restated as if fully set forth herein.

66. Presidential authority to unilaterally impose worldwide tariffs, if Congress were to grant it at all, must be granted clearly and unmistakably—not through some implication so vague and indeterminate that it went unnoticed by every other President for nearly five decades. *See Nat'l Fed'n of Indep. Bus. v. Occupational Safety & Health Admin.*, 595 U.S. at 125

(quoting *Whitman*, 531 U.S. at 468) ("Congress does not usually 'hide elephants in mouseholes.'").

67. IEEPA does not mention tariffs or duties, nor at any point does it suggest that it is granting the power to lay and collect such tariffs or duties.

68. There is no precedent for using IEEPA to impose tariffs. No other President has ever done so or ever claimed the power to do so.

69. The existence of trade deficits in goods with some other countries does not qualify as a national emergency, as required by IEEPA.

70. The existence of trade deficits in goods with some other countries is not an unusual and extraordinary threat, as required by IEEPA.

71. The prosecution of the former leader of a third-country for corruption does not constitute a national emergency nor is it an unusual and extraordinary threat, as required by IEEPA.

72. Courts are generally skeptical of newly claimed grants of authority discovered for the first time in decades-old statutes. *Utility Air Regulatory Group v. EPA*, 573 U.S. 302, 324 (2014) ("When an agency claims to discover in a long-extant statute an unheralded power to regulate 'a significant portion of the American economy,' . . . we typically greet its announcement with a measure of skepticism.") (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000)).

73. Indeed, Congress passed IEEPA to limit what it saw as presidential abuses of emergency authorities in the years prior to 1977. Peter E. Harrell, *The Case Against IEEPA Tariffs*, Lawfare, Jan. 31, 2025 (available at https://www.lawfaremedia.org/article/the-case-against-ieepa-tariffs).

74. Congress knows how to grant the President authority to impose or adjust tariffs when it wishes to, and it has done so in more limited statutes contained in Title 19 of the United States Code. But the President has decided to avoid the limits on his authority imposed by Congress by finding a new never-before-seen authority under IEEPA.

75. The President's interpretation of IEEPA is not entitled to deference—rather, it is the duty of the courts to independently "determine the best reading" of the statute at issue. *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 400 (2024).

76. IEEPA does not grant the President power to impose tariffs at all—it does not mention such a power or imply it. The President's actions exceed the statutory authority Congress granted him.

77. "Courts expect Congress to speak clearly if it wishes to assign to an agency decisions of vast economic and political significance." *West Virginia v. EPA*, 597 U.S. 697, 716 (2022) (cleaned up) (quoting *Utility Air Regulatory Group v. EPA*, 573 U. S. 302, 324 (2014)). The assertion that IEEPA grants the President his claimed authority raises a major question that requires Congress to speak clearly in granting such a broad and consequential power to upend the global economy.

78. "In the absence of a clear mandate in the Act, it is unreasonable to assume that Congress intended to give the [President] the unprecedented power over American industry that would result from the Government's view." *Indus. Union Dep't, AFL-CIO v. API*, 448 U.S. 607, 645 (1980). If anything qualifies as a "decision . . . of vast economic and political significance," requiring a clear statement under the major question doctrine, this is it. *West Virginia*, 597 U.S. at 716.

79. The Administration is now attempting to reframe the tariffs as "surcharges" or "fees" to avoid constitutional scrutiny, with Treasury Secretary Scott Bessent publicly asserting that "tariffs are a surcharge" comparable to paying a driver's license fee. This re-labeling does not change their essential character as taxes on imported goods within the meaning of Article I, Section 8.

80. The Liberation Day Order would impose an estimated average of almost $1,300 in new taxes per year on American households, for a total tax burden of some $1.4 to 2.2 billion over the next ten years, reducing US gross domestic product by some 0.8% (without accounting for retaliation by foreign states). Erica York & Alex Durante, *Trump Tariffs: The Economic Impact of the Trump Trade War*, Tax Foundation, Apr. 11, 2025 (available at https://taxfoundation.org/research/all/federal/trump-tariffs-trade- war).

81. This impact is at least as large—and likely much larger—than executive actions previously found by the Supreme Court to be "major questions," requiring a clear statement by Congress to authorize executive discretion. *See, e.g., Biden v. Nebraska*, 600 U.S. 477 (2023) (approximately $400 billion in student loan forgiveness); *West Virginia v. Environmental Protection Agency*, 597 U.S. 697 (2022) (EPA authority to regulate carbon emissions where the administration had not offered a specific emission reduction plan); *Nat'l Fed'n of Indep. Bus. v. Occupational Safety & Health Admin.*, 595 U.S. 109 (2022) (pandemic-era vaccination mandate for workers employed by firms with 100 or more employees); *Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758 (2021) (temporary pandemic-era nationwide eviction moratorium).

82. The tariffs illegally imposed by the President via IEEPA directly and irreparably harm Plaintiffs, who will face increase costs for the goods they sell, less demand for their higher

priced products, and disrupted supply chains, among other threats to their livelihood, up to

and including potentially bankrupting otherwise solvent companies.

**Count II: If the IEEPA Grants Broad, Unlimited Authority to Issue Tariffs Worldwide to the President, It Is an Unconstitutional Delegation of Legislative Authority**

83. The allegations of paragraphs 1 through 64 are incorporated by reference and restated as if

fully set forth herein.

84. Article I, Section 1 of the Constitution provides that "[a]ll legislative powers herein granted

shall be vested in a Congress of the United States." U.S. Const. art. I, § 1.

85. The nondelegation doctrine is at bottom an attempt to take this provision seriously: there

are legislative powers to make laws, and all such power resides in the Congress. *See  Dep't

of Transp. v. Ass'n of Am. R.R.*, 575 U.S. 43, 74 (2015) (Thomas, J., concurring) ("[T]he

separation of powers is, in part, what supports our enduring conviction that the Vesting

Clauses are exclusive and that the branch in which a power is vested may not give it up or

otherwise reallocate it.").

86. Implicit in this setup is the premise that neither branch may delegate its sphere of power to

any other. "The Vesting Clauses, and indeed the entire structure of the Constitution, make

no sense [if there is no limit on delegations]." Gary Lawson, *Delegation and Original

Meaning*, 88 Va. L. Rev. 327, 340 (2002).

87. "The nondelegation doctrine is rooted in the principle of separation of powers that underlies

our tripartite system of Government." *Mistretta v. United States*, 488 U.S. 361, 371 (1989).

88. The Court therefore requires that any grant of regulatory authority be provided with an

"intelligible principle" that will form the basis of agency action. *See A.L.A. Schechter

Poultry Corp. v. United States*, 295 U.S. 495, 529 (1935); *Panama Refining Co. v. Ryan*,

293 U.S. 388, 430 (1935).

89. The basic requirement that derives from the Supreme Court's cases is that "Congress must set forth standards sufficiently definite and precise to enable Congress, the courts, and the public to ascertain whether Congress's guidance has been followed." *Gundy v. United States*, 588 U.S. 128, 158 (2019) (Gorsuch, J., dissenting) (quoting *Yakus v. United States*, 321 U. S. 414, 426 (1944)).

90. IEEPA does not authorize tariffs at all, and this Court should so hold, by applying the rule of constitutional avoidance if necessary. But even if IEEPA did grant the President the broad, standardless discretion he claims—which it does not—and had done so clearly enough to satisfy the major questions doctrine—which it has not—it would be an unlawful delegation of legislative authority without any intelligible governing principle.

91. If there are any constitutional limits to delegation at all, they apply here, in a case where the executive claims virtually limitless authority to impose massive tax increases and start a worldwide trade war. This is the most "sweeping delegation of legislative power" claimed by the executive since the Supreme Court invalidated the National Recovery Act in 1935. *Schechter Poultry*, 295 U.S. at 539; see id. at 542 (noting that the NRA gave the "virtually unfettered'' discretion to the President "in approving or prescribing codes, and thus enacting laws for the government of trade and industry throughout the country").

92. "The Government's theory would give [the President] power to impose enormous costs that might produce little, if any, discernible benefit." *Indus. Union Dep't*, 448 U.S. at 645.

93. This interpretation would render the Act the equivalent of the delegations the Supreme Court previously struck down, "one of which provided literally no guidance for the exercise of discretion, and the other of which conferred authority to regulate the entire economy on

the basis of no more precise a standard than stimulating the economy by assuring 'fair competition.'" *Whitman*, 531 U.S. at 474.

94. This interpretation of the IEEPA would constitute a "sweeping delegation of legislative power" of the kind rejected in previous Supreme Court cases. *Indus. Union Dep't*, 448 U.S. at 646 (quoting *Schechter Poultry*, 295 U.S. at 539).

95. If longstanding, perfectly normal, bilateral trade deficits qualify as an "emergency" and as an "unusual and extraordinary threat," the same can be said of virtually any international economic transaction that the President disapproves of for virtually any reason. The President would have the power to impose any level of tariffs on goods or services from any country, for any purpose, pretty much anytime he wants.

96. The sheer breadth of this claimed power—to impose tariffs at any level on any country at any time, at levels that could very well crash the global economy— counsels against reading IEEPA to confer such an extreme delegation of authority. *Crowell v. Benson*, 285 U.S. 22, 62 (1932) ("When the validity of an act of the Congress is drawn in question, and even if a serious doubt of constitutionality is raised, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided.").

97. IEEPA provides no intelligible principle for the imposition of tariffs—indeed, it provides no principle at all by which this Court, or anyone else, might determine whether the guidance Congress provided has been followed.

98. The tariffs illegally imposed by the President via the unconstitutional delegation of authority under IEEPA directly and irreparable harm Plaintiffs, who will face increase costs for the goods they sell, less demand for their higher prices products, and disrupted supply

chains, among other threats to their livelihood, up to and including potentially bankrupting otherwise-solvent companies.

**Count III: If the Tariffs are Found to be Valid, they are Violation of In-Transit Exemptions — Unlawful Assessment of Duties on Goods Already in Transit**

99. Plaintiff re-alleges and incorporates paragraphs 1 through 64 as if fully set forth herein.

100.    In the alternative to Counts I and II, Plaintiff alleges that, even if the tariffs imposed under the International Emergency Economic Powers Act ("IEEPA") were lawfully promulgated, they were applied in violation of the in-transit exemptions contained in the applicable executive orders. Several of Netuno's shipments that had departed their ports of origin before the effective dates were improperly assessed higher duties despite qualifying for in-transit treatment.

101.    The executive orders challenged in this action — including Executive Order 14257 (Reciprocal Tariffs), Executive Order 14323 (Additional Duties on Products of Brazil), and Executive Order 14329 (Additional Duties on Products of India) — each contain explicit in-transit provisions exempting from the new tariff rates goods that were "loaded onto a vessel at the port of loading and in transit on the final mode of transit" before the applicable effective date, provided that such goods were entered for consumption before the stated closing date.

102.    Several of Netuno's shipments of seafood products departed Brazil, India, and other foreign ports prior to the effective dates established in these orders and were already en route to the United States. These shipments were lawfully within the "on the water" exemption window and therefore should have been assessed under the prior, lower tariff schedule.

103.     Despite this, U.S. Customs and Border Protection, acting under the challenged executive orders, wrongly denied the exemption status to Netuno's shipments because the vessels stopped at intermediary ports — including Panama and other regional transshipment hubs — where containers were off-loaded and re-loaded onto feeder vessels for their final leg to U.S. ports.

104.     The agencies' interpretation that such transshipment voids the in-transit exemption is contrary to the plain language of the executive orders, which protect all goods "in transit on the final mode of transit" that had already departed their ports of origin prior to the effective date. Routine transshipment through intermediary ports does not constitute a new "mode of transit" or a new "port of loading" within the meaning of those provisions.

105.     By assessing higher duties on these shipments, Defendants acted arbitrarily and in excess of statutory and delegated authority, in violation of the governing orders, the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), and the equitable principles that prohibit the retroactive application of tariffs to goods already in foreign commerce.

106.     As a direct result, Netuno has paid and continues to owe duties that were unlawfully assessed, reducing available working capital, constraining inventory, and limiting its ability to meet domestic seafood demand from sustainable foreign fisheries.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray that the Court grant the following relief:

a.  Declare that IEEPA does not grant the President statutory authority to unilaterally impose tariffs;

b.  Declare that the President has not identified a valid national emergency as required by IEEPA and that the continued existence of trade deficits in goods is not in and of itself a national emergency;

c.  Declare that the President has failed to make any showing of an "unusual and extraordinary threat" as required by IEEPA;

d.  Declare that, if Congress has granted the President unilateral authority to impose global tariffs of any amount at his whim, it is an unconstitutional delegation of legislative power;

e.  Enjoin the operation of the March 3, 2025, Executive Order entitled "Further Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China" with respect to the Plaintiff in this action;

f.  Enjoin the operation of the April 2, 2025, Executive Order entitled "Regulating Imports with a Reciprocal Tariff to Rectify Trade Practices that Contribute to Large and Persistent Annual United States Goods Trade Deficits" with respect to the Plaintiff in this action;

g.  Enjoin the operation of the April 9, 2025, Executive Order entitled "Modifying Reciprocal Tariff Rates To Reflect Trading Partner Retaliation And Alignment" with respect to the Plaintiff in this action;

h.  Enjoin the operation of the July 30, 2025, Executive Order entitled "Addressing Threats to the United States by the Government of Brazil" with respect to the Plaintiff in this action;

i.  Enjoin the operation of the July 31, 2025, Executive Order entitled "Further Modifying the Reciprocal Tariff Rates" with respect to the Plaintiff in this action;

j.  Enjoin the operation of the July 31, 2025, Executive Order entitled "Amendment to Duties to Address the Flow of Illicit Drugs Across Our Northern Border" with respect to the Plaintiff in this action;

k.  Enjoin the operation of the August 6, 2025, Executive Order entitled "Addressing Threats to the United States by the Government of the Russian Federation" with respect to the Plaintiff in this action;

l.  Declare the assessment of duties on shipments that departed origin ports prior to the applicable effective dates unlawful;

m.  Award Plaintiffs damages in the amount of any tariffs collected by Defendants pursuant to the challenged orders;

n.  Award Plaintiffs other such damages as are appropriate;

o.  Award Plaintiffs their attorneys' fees and costs under the Equal Access to Justice Act, 28 U.S.C. § 2412(d), and any other applicable law; and

p.  Grant any such other relief as this Court may deem just or proper.

Dated: November 6, 2025                                 Respectfully Submitted,

   /s/ Vinicius Adam, Esq.   
Vinicius Adam
VAdam Law
511 SE 5th Ave., Suite 104
Fort Lauderdale, FL 33301
Phone: (954) 451-0792
Fax: (267) 430-8862
vinicius@vadamlaw.com
service@vadamlaw.com
Attorney for Netuno USA, Inc.